IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| JOE DUNN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. CV-08-23-S-BLW |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **DECISION** |
| | ) | **AND ORDER** |
| M. NANCE, Boise Police K-9 Officer; | ) | |
| DAVE HUNSAKER; DAVE HOFMANN; | ) | |
| and JEFF DUSTIN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Now pending before the Court is Defendants' Motion for Summary

Judgment (Docket No. 15). Having carefully reviewed the record and otherwise

being fully advised, the Court enters the following Memorandum Decision and

Order:

## I.  FACTUAL BACKGROUND[1]

---

[1]  Because the Motion before the Court is Defendants' Motion for Summary Judgment, the following recitation construes the facts, and all reasonable inferences derived therefrom, in a light most favorable to the Plaintiff.  In doing so, the Court recognizes that the facts presented at trial may differ from these facts in important ways; however, at this stage of the litigation, the Court must consider the facts in the light most favorable to Plaintiff.

**MEMORANDUM DECISION AND ORDER - 1**

On February 25, 2007, police responded to a silent alarm at Pacific Recycling in Boise, Idaho.  *See* Defs.' Statement of Undisputed Facts ("UF") at ¶ 1, p. 2 (Docket No. 15, Att. 2); Pl.'s Resp. to UF at ¶ 1, p. 1 (Docket No. 21). Upon arrival, Defendant Officers Hunsaker and Hofmann noticed a hole in the side of the Pacific Recycling building.  *See* Defs.' UF at ¶ 5, p. 2 (Docket No. 15, Att. 2); Pl.'s Resp. to UF at ¶ 5, p. 2 (Docket No. 21).  The officers then looked into the front door's window, observing another hole in the sheet rock that led from an office area into the front lobby of the Pacific Recycling business.  *See* Defs.' UF at ¶ 6, p. 2 (Docket No. 15, Att. 2); Pl.'s Resp. to UF at ¶ 6, p. 2 (Docket No. 21). Numerous drawers were ajar and papers were strewn about on the floor.  *See id*.

Believing that a possible suspect was still inside the Pacific Recycling building, Officer Hunsaker requested a police K-9 to respond, as well as other officers to assist.  *See* Defs.' UF at ¶ 7, p. 3 (Docket No. 15, Att. 2); Pl.'s Resp. to UF at ¶ 6, p. 2 (Docket No. 21).  In the meantime, Officers Hunsaker and Hofmann continued their inspection of the scene, determining that the hole in the side of the Pacific Recycling building was large enough for an adult male to crawl through. *See* Defs.' UF at ¶ 8, p. 3 (Docket No. 15, Att. 2); Pl.'s Resp. to UF at ¶ 8, p. 2 (Docket No. 21).  Moreover, Officer Hunsaker conducted a quick inspection of the

**MEMORANDUM DECISION AND ORDER - 2**

evergreen bushes surrounding the outside of the hole;[2] he did not see anyone at that time.  *See* Defs.' UF at ¶ 9, p. 3 (Docket No. 15, Att. 2); Pl.'s Resp. to UF at ¶ 9, p. 2 (Docket No. 21).  Officer Hunsaker also repeated his request for a K-9 officer on several occasions.  *See id*.[3]

When Defendant Officer Nance arrived at the scene with "Blek," his police service dog, Officer Hunsaker showed Officer Nance the hole in the side of the Pacific Recycling building.  *See* Defs.' UF at ¶ 10, p. 3 (Docket No. 15, Att. 2); Pl.'s Resp. to UF at ¶ 10, p. 2 (Docket No. 21).  Officer Nance then directed Blek to smell the hole to determine whether a suspect was inside.  *See* Defs.' UF at ¶ 11, p. 3 (Docket No. 15, Att. 2); Pl.'s Resp. to UF at ¶ 11, p. 2 (Docket No. 21). Because Blek indicated that the suspect was not near the hole, Officer Nance believed the suspect to be further back within the Pacific Recycling building.  *See id*.

While discussing a plan to enter the Pacific Recycling building, Officer

_____

[2]  These evergreen bushes were about two-feet tall and measured approximately 10 feet by 20 feet in total area.  *See* Defs.' UF at ¶ 4, p. 2 (Docket No. 15, Att. 2); Pl.'s Resp. to UF at ¶ 4, p. 1 (Docket No. 21); *see also* Ex. E to 10/27/08 Scott B. Muir Aff. at ¶ 2, p. 2 (Docket No. 15, Att. 3).  Additionally, the area was not well-lit.  *See* Defs.' UF at ¶ 4, p. 2 (Docket No. 15, Att. 2); *see also* Pl.'s 9/23/08 Depo. at 17:19-18:1, attached as Ex. F. to 10/27/08 Scott B. Muir Aff. at ¶ 3, p. 2 (Docket No. 15, Att. 3).

[3]  In his response to Defendants' Statement of Material Facts, Plaintiff states: "I don't know what he did c[a]lling for K-9."  *See* Pl.'s Resp. to UF at ¶ 9, p. 2 (Docket No. 21). Plaintiff's statement in this respect is not sufficiently clear to contradict the apparent reality that Officer Hunsaker again requested a K-9 unit.

**MEMORANDUM DECISION AND ORDER - 3**

Nance gave Blek a hand instruction to search the surrounding evergreen bushes, hoping that Blek would give some indication that the suspect was inside or, possibly, start a track away from the building so officers could readjust their search perimeter.  *See* Defs.' UF at ¶¶ 14-15, p. 4 (Docket No. 15, Att. 2); Pl.'s Resp. to UF at ¶¶ 14-15, p. 2 (Docket No. 21).  Blek walked up to the hole in the wall, smelled inside it, then walked about ten feet before stopping.  *See id.*

Blek's tail was now standing straight up, apparently indicating that he was in "some type of odor."  *See* Defs.' UF at ¶ 16, p. 4 (Docket No. 15, Att. 2); Pl.'s Resp. to UF at ¶ 16, p. 2 (Docket No. 21).  Officer Nance then turned his flashlight on the evergreen bushes and saw a person's leg (Plaintiff's leg) in camouflaged pants in the bushes nearby.  *See id.*[4]  Not knowing whether the suspect had a weapon in his possession and fearing for his (and the other officers') safety, Officer Nance gave Blek verbal commands to bite and hold.  *See* Defs.' UF at ¶ 17, pp. 4-5 (Docket No. 15, Att. 2).  Plaintiff claims that Blek had already bitten him before Officer Nance gave these verbal commands.  *See* Pl.'s Resp. to UF at ¶ 17, p. 3 (Docket No. 21).  Regardless of the timing of Blek's bite vis-à-vis Officer Nance's verbal command, there is no dispute that Blek proceeded to bite and hold

---

[4] Plaintiff does not disagree with Defendants' recitation of the facts in this discrete sense, stating only that "Officer Nance should of [sic] announced a warning that if I don't come out, he was going to send in the dogs."  *See* Pl.'s Resp. to UF at ¶¶ 14-16, p. 2 (Docket No. 21).

**MEMORANDUM DECISION AND ORDER - 4**

Plaintiff's leg while Plaintiff was lying in or near the bushes.  *See* Defs.' UF at ¶ 18, p. 5 (Docket No. 15, Att. 2).

While Blek bit and held Plaintiff's leg, Officer Hunsaker drew his service weapon to cover Plaintiff until Blek was released and Plaintiff was under control. *See* Defs.' UF at ¶ 18, p. 5 (Docket No. 15, Att. 2).  Plaintiff alleges he did not resist.  *See* Pl.'s Compl. at ¶¶ 19, 20, 22, 25, & 30, pp. 5-6 (Docket No. 3).  Still, despite Plaintiff's lack of resistance, neither Officers Hunsaker, Hofmann, nor Nance attempted to release Blek's bite until after Plaintiff was handcuffed - a period in excess of one minute; instead, according to Plaintiff, the officers laughed at what was taking place.  *See id*. at ¶¶ 22 & 26, pp. 5-6; *see also* Pl.'s Resp. to UF at ¶¶ 18, 20, & 22, p. 3 (Docket No. 21).

Plaintiff was then transported to the emergency room at St. Alphonsus where his wound    (a four-inch laceration on his knee) was cleaned, stitched, and stapled shut.  *See* Pl.'s Compl. at ¶¶  28-30, p. 6 (Docket No. 3).  Ultimately, Plaintiff was arrested and charged with burglary and providing false information to the police. Plaintiff pled guilty and is currently serving a ten-year sentence in the Idaho State Correctional Institution.

Plaintiff now brings a federal civil rights suit under 42 U.S.C. § 1983 against four Boise police officers – M. Nance, Dave Hunsaker, Dave Hofmann, and Jeff

**MEMORANDUM DECISION AND ORDER - 5**

Dustin – in their individual and official capacities.  Plaintiff also alleges state-law claims of assault, battery, abuse of process, and negligence against these same officers.  Plaintiff appears to allege that the Defendant police officers used excessive force when not only releasing Blek without first issuing a verbal warning, but also continuing to allow Blek to bite and hold Plaintiff when Plaintiff was already lying flat on the ground, with his arms outstretched in full view of the officers.

## II.  PROCEDURAL BACKGROUND

This Court originally reviewed Plaintiff's Complaint to determine whether summary dismissal was appropriate.  *See* Initial Review Order (Docket No. 6). Following that review, Plaintiff was allowed to proceed with his §1983 claim under the Fourth Amendment, as well as his state-law tort claims under the Court's supplemental jurisdiction powers.  *See id*. at pp. 2-3.

Defendants now move for summary judgment as to each of these claims. First, Defendants argue that the use of a K-9 unit under the circumstances presented here does not constitute an unreasonable search and seizure under the Fourth Amendment, thus compromising Plaintiff's § 1983 claim.  *See* Mem. in Supp. of Mot. for Summ. J., p. 3 (Docket No. 15, Att. 6).  Second, Defendants argue that, even if an unreasonable search and seizure occurred, the Defendants are

**MEMORANDUM DECISION AND ORDER - 6**

entitled to qualified immunity.  *See id*.  Finally, Defendants argue that Plaintiff's state-law claims are without merit based on the facts and the law of this case.  *See id*.

### III.  ANALYSIS

**A.    Summary Judgment Standard of Review**

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  *Id*. at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings.  *Id*. at 255.  Direct testimony of the non-movant must be believed, however implausible.  *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).  On the other hand, the Court is

not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in his favor. *Id*. at 256-57. The non-moving party must go beyond the pleadings and show "by [his] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324.

However, the Court is "not required to comb though the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forseberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th

**MEMORANDUM DECISION AND ORDER - 8**

Cir. 2003).

## B.    Defendants' Qualified Immunity Defense

"Qualified immunity serves to shield government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 971 (9th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The Supreme Court has set forth the following two-pronged inquiry to resolve all qualified immunity claims:

> First, taken in the light most favorable to the party asserting the injury, do the facts alleged show the officers' conduct violated a constitutional right?  Second, if so, was that right clearly established?  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  This inquiry is wholly objective and is undertaken in light of the specific factual circumstances of the case.

*Id*. (internal quotations and citations omitted).[5]  Thus, a district court should

---

[5]  This structured two-step analysis, originally required by *Saucier v. Katz*, 533 U.S. 194 (2001), is no longer mandatory in all cases.  *See Pearson v. Callahan*, 555 U.S. ----, ----, 129 S. Ct. 808 (2009).  In *Pearson*, the Supreme Court recently held:

> On reconsidering the [two-step] procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.  The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs

**MEMORANDUM DECISION AND ORDER - 9**

"concentrate at the outset on the definition of the constitutional right and determine whether, on the facts alleged, a constitutional violation could be found." *Billington v. Smith*, 292 F.3d 1177, 1184 (9th Cir. 2002) (internal quotations and citations omitted). If a constitutional violation can be found, the court then decides whether the violation was the source for clearly established law that was contravened in the circumstances of the case. *Id*.

Because qualified immunity is "an immunity from suit rather than a mere defense to liability . . ." its application here will be examined first[6] in the context of Plaintiff's allegations against the Defendant officers. *Pearson*, 129 S.Ct. at 815 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

1.   Step One:  Excessive Force Claims and the Fourth Amendment

All claims alleging that a law enforcement officer used excessive force – deadly[7] or otherwise –  in the course of an arrest, investigatory stop, or other

---

of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

*Id*. at 818.  Here, keeping in mind the benefit of promoting the development of constitutional precedent, this Court will proceed in the traditional two-step format.

[6]  Additionally, and as a practical matter, the first step of the qualified immunity inquiry necessarily addresses whether, in fact, a Fourth Amendment violation based on the Defendant officers' alleged use of excessive force is even implicated.

[7]  The Ninth Circuit has expressly held that the use of a police dog, trained to bite and hold a suspect's arms or legs, results only in a remote risk of death and, hence, does not constitute deadly force. *See Miller v. Clark County*, 340 F.3d 959, 962-63 (9th Cir. 2003); *see*

**MEMORANDUM DECISION AND ORDER - 10**

"seizure" should be analyzed under the Fourth Amendment and its

"reasonableness" standard.  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  In

other words, the Fourth Amendment requires police officers making an arrest to

use only an amount of force that is objectively reasonable in light of the

circumstances confronting them.

Whether a specific use of force is reasonable requires a court to balance the

nature and quality of the intrusion on an individual's liberty with the

countervailing governmental interests at stake.  *Id*. at 396 ("Our Fourth

Amendment jurisprudence has long recognized that the right to make an arrest or

investigatory stop necessarily carries with it the right to use some degree of

physical coercion or threat thereof to effect it."); *see also Smith v. City of Hemet*,

394 F.3d 689, 701 (9th Cir. 2005) (en banc).  That analysis should be approached

using the following  three-step inquiry:

First, the gravity of the particular intrusion on Fourth Amendment interests is

assessed by evaluating the type and amount of force inflicted.  *See Miller v. Clark*

*County*, 340 F.3d 959, 964 (9th Cir. 2003) (citing *Chew v. Gates*, 27 F.3d 1432,

1440 (9th Cir. 1994)).  Second, the importance of the government interests is taken

_____

*also Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) (redefining definition of deadly force
to mean force carrying with it substantial risk of causing death or serious bodily harm).

into account by evaluating:  "(1) the severity of the crime at issue, (2) whether the

suspect poses an immediate threat to the safety of the officers or others, and (3)

whether he is actively resisting arrest or attempting to evade arrest by flight."

*Smith*, 394 F.3d at 701 (quoting *Graham*, 490 U.S. at 396).[8]  Third, the gravity of

the intrusion on the alleged victim's liberty is balanced against the government's

need for that intrusion.  *Miller*, 340 F.3d at 964 (citing *Headwaters Forest Defense*

*v. County of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2000) (reaffirmed after

remand by *Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125,

1127 (9th Cir. 2002))).

Determining whether the Defendant officers violated Plaintiff's Fourth

Amendment rights  requires an examination of two time periods:  (1) when Officer

---

[8]  Interestingly, the Boise Police Department's K-9 policy discusses these same components when deciding whether to employ a canine, stating:

> Decisions to deploy the canine shall be based upon the following:
>
> • The severity of the crime.
>
> • Whether the suspect poses an immediate threat to the safety of officers and others.
>
> • Whether the suspect is actively resisting arrest or attempting to evade arrest at the time.
>
> • Whether deployment of the canine presents a danger to the safety of uninvolved citizens and other officers.

*See* K-9 Operating Procedure at p. 3, attached as Ex. C. to 10/27/08 Mike R. Nance Aff. at ¶ 6, p. 2 (Docket No. 15, Att. 4).

**MEMORANDUM DECISION AND ORDER - 12**

Nance first released Blek to conduct a perimeter search; and (2) when Blek

continued to bite and hold Plaintiff while Plaintiff was lying flat on the ground,

with his arms outstretched in full view of the officers.

> a. *By First Releasing Blek Without a Warning, Did the Defendant*
> *Officers Violate Plaintiff's Fourth Amendment Rights?*

Taken in the light most favorable to Plaintiff, the nature and quality of the

intrusion on Plaintiff's liberty was sufficiently profound to raise issues concerning

the Plaintiff's Fourth Amendment rights.  While the force used to initially detain

Plaintiff was not deadly, it was considerable; that is, Blek was trained to bite and

hold a suspect's arm or leg and there is no dispute the Blek did so with respect to

Plaintiff here.  Indeed, once Blek attacked Plaintiff, Plaintiff could barely move, let

alone stand, when he was discovered hiding in the bushes outside the Pacific

Recycling building.  Further, it is undisputed that, as a direct result of Blek's biting

and holding Plaintiff, Plaintiff suffered an injury to his leg that required medical

attention.  Combined, these factors suggest that the intrusion on Plaintiff's Fourth

Amendment interests was significant.

Plaintiff's affected interests, however, are not dispositive; under *Graham*, the

government interests at stake must also be examined, mindful of the three factors

identified in *Graham* as relevant to this task (*see supra* at pp. 9-10).  First, Plaintiff

committed a felony by burglarizing the Pacific Recycling building.  It is in this

**MEMORANDUM DECISION AND ORDER - 13**

milieu that "[t]he government has an undeniable legitimate interest in apprehending criminal suspects, . . . and that interest is even stronger when the criminal is . . . suspected of a felony." *See Miller*, 340 F.3d at 964 (citations omitted). Second, there is no question that Plaintiff posed an immediate threat to the safety of the Defendant officers (and perhaps others) leading up to the time that Officer Nance first released Blek. A burglary had occurred; it was nighttime; and Plaintiff was hiding from police in an unlighted area surrounded by two-foot-high bushes. The risk of Plaintiff staging an ambush and commensurate danger to the Defendant officers were clearly present under these circumstances. Third, it is obvious to this Court that Plaintiff was attempting to evade the police officers by hiding in the nearby bushes.[9] Each of these *Graham* factors (the severity of Plaintiff's original crime, the threat posed to the officers who responded to the silent alarm, and Plaintiff's active attempt to avoid arrest by remaining concealed in the bushes) favors the government.

Keeping in mind both the intrusion on Plaintiff's Fourth Amendment

---

[9] Plaintiff's comment that Officer Nance "could not have missed him because [he] was lying on top of the bushes" (*see* Pl.'s Resp. to UF at ¶ 13, p. 2 (Docket No. 21)) is not convincing. First, it illogically suggests that a police officer must first find a suspect before releasing a K-9 unit to find that same suspect. Second, and most importantly, Plaintiff himself testified during his deposition that he was intending to hide from the officers and that the officers did not see him until Blek bit him. *See* Pl.'s 9/23/08 Depo. at 13:9-17; 17:19-18:6, attached as Ex. F. to 10/27/08 Scott B. Muir Aff. at ¶ 3, p. 2 (Docket No. 15, Att. 3).

**MEMORANDUM DECISION AND ORDER - 14**

interests caused by the dog bite, and the strong countervailing government interests in safely arresting Plaintiff, using Blek to conduct an area search of the Pacific Recycling building was reasonably necessary.  The Boise Police Department's K-9 policy in effect at the time permits the unannounced use of police canines to locate suspects and/or evidence within a specified open area, and this policy is consistent with the *Graham* balancing test.  *See* K-9 Operating Procedure at p. 4, attached as Ex. C. to 10/27/08 Mike R. Nance Aff. at ¶ 6, p. 2 (Docket No. 15, Att. 4).  Simply put, Blek's employ neutralized any advantage that Plaintiff maintained by hiding in the bushes – a situation that, up until that point, went unnoticed by the police officers themselves as they investigated the crime scene.  *See Miller*, 340 F.3d at 968 ("In sum, Deputy Bylsma knew that a police dog's excellent canine qualities were well suited to the important task of capturing a fleeing felon in this ominous setting, a threatening landscape that might have filled even staunch human hearts with dread.").  That use (and associated force) is reasonable because unrestrained suspects have an opportunity to "hide, flee anew, to recover a weapon, to harm the dog, or to prepare to launch an ambush against the deputies."  *Rathman v. Pierce County*, 2008 WL 701575 (W.D. Wash. 2008) (unpublished).

Viewing the evidence in the light most favorable to Plaintiff, this Court concludes that it was proper police procedure to use Blek to originally locate and apprehend Plaintiff.  In doing so, the Defendant officers did not violate Plaintiff's

**MEMORANDUM DECISION AND ORDER - 15**

Fourth Amendment rights when Blek was released without a warning.

> **b.** *By Allowing Blek to Bite and Hold Plaintiff After Plaintiff was Subdued, Did the Defendant Officers Violate Plaintiff's Fourth Amendment Rights?*

Having already determined that Blek's initial release to locate and control

Plaintiff without a verbal warning did not itself violate Plaintiff's Fourth

Amendment rights, we now turn to the related (but temporally distinct) issue

regarding the *extent* of Blek's bite and hold.  Specifically, Plaintiff repeatedly

claims that Blek continued to bite and hold him even after he was subdued,

alleging:

- While the dog was going crazy trying to get at the plaintiff, he was still flat on the ground "not resisting", and was looking up at the officers waiting for their commands, or for one of the officers to get on top of him to put handcuffs on.

- Defendant "Nance" while plaintiff was still prone[ ] out flat on the ground not resisting, gave commands for the dog to attack, and kept giving these commands while the dog was viciously tearing into him.

- The entire time the police dog was attacking plaintiff he was not resisting at all, but the defendants kept yelling for him to stop resisting[,] [a]nd "Nance" and the other officers were laughing while doing this.

- Plaintiff curled up into the fetal position while being attacked by the Dog, and was not even pushing or putting his hands on it, at the times when the defendants were yelling at him to stop resisting.

**MEMORANDUM DECISION AND ORDER - 16**

- At no time did the plaintiff in this case do "anything" to resist any of the defendants, before or after, his dog attack and his hands were out so they could be seen.

*See* Pl.'s Compl. at ¶¶ 19, 20, 22, 25, & 30, pp. 5-6 (Docket No. 3).  Likewise, in response to Defendants' summary judgment efforts, Plaintiff appears to assert that Blek bit and held him for more than one minute (*see* Pl.'s Resp. to UF at ¶¶ 18 & 20, p. 3 (Docket No. 21)), contradicting Defendant Nance's estimate that "Blek was on the 'bite' [for] ten seconds" (*see*  Defs.' UF at ¶ 20, pp. 4-5 (Docket No. 15, Att. 2) (citing 10/27/08 Mike R. Nance Aff. at ¶ 21 (Docket No. 15, Att. 4))).

At this stage of the litigation, it is not this Court's task to determine exactly how long Blek was permitted to bite and hold Plaintiff; instead, as previously mentioned, it must consider the facts in the light most favorable to Plaintiff.  With that standard in mind, the Court must assume, for purposes of the pending motion, that Blek continued to bite and hold Plaintiff for more than one minute, even as Plaintiff was lying flat on the ground, not resisting, and with his arms outstretched in full view of the officers.  Therefore, the Court finds that, on the facts alleged, a constitutional violation could have occurred during this discrete time period.  *See Billington*, 292 F.3d at 1184; *see also Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) (holding that "excessive duration of the bite . . . could

**MEMORANDUM DECISION AND ORDER - 17**

constitute excessive force"); *Miller*, 340 F.3d at 962 (considering a police dog's bite lasting "up to one minute[ ] an unusually long bite duration").  Ordering or allowing a police canine to bite a suspect for more than one minute under the circumstances described above could amount to excessive force.[10]  Therefore, the court must consider the second prong of Defendants' qualified immunity claim – whether it was clearly established at the time of the incident that such conduct violated the Plaintiff's constitutional rights.  *See supra* at pp. 7-8.

2.      Step Two: Violation of Clearly Established Law

"Whether a right is 'clearly established' for purposes of qualified immunity is an inquiry that 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'  In other words, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he

---

[10] This finding relates only to Defendant Officers Nance, Hunsaker, and Hofmann.  *See, e.g.*, *Chuman v. Wright*, 76 F.3d 292, 294-95 (9th Cir. 1996) (holding that every officer who provided armed backup for another officer who unconstitutionally deployed a flash-bang device to gain entry to a suspect's home could be held liable for that use of excessive force because "every officer participated in some meaningful way" in the arrest and "every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flash-bang would be deployed").  Nowhere in the Complaint's allegations or in Plaintiff's response to Defendants' Motion for Summary Judgment is there any substantive reference to Defendant Officer Dustin or any "meaningful" participation on his behalf.  Apparently, Officer Dustin investigated the crime.  *See* Mem. in Supp. of Mot. for Summ. J., p. 12 (Docket No. 15, Att. 6).  While Defendants claim that Plaintiff admitted at his deposition that he does not believe that Officer Dustin did anything wrong that caused him damage (*see id.*), the pertinent portions of the deposition transcript (pages 14 and 15) do not appear to be attached to Scott Muir's October 27, 2008 Affidavit.  Regardless, the Court is unaware of any allegations or arguments that prevent the entry of summary judgment in Officer Dustin's favor here.

**MEMORANDUM DECISION AND ORDER - 18**

is doing violates that right.'" *Graves v. City of Coeur d'Alene*, 339 F.3d 828, 846

(9th Cir. 2003) (quoting *Saucier*, 533 U.S. at 201-02 (other citations omitted)); *see*

*also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("[I]f officers of reasonable

competence could disagree on [the] issue, immunity should be recognized.");

*Moran v. Washington*, 147 F.3d 839, 844 (9th Cir. 1998) ("[Qualified immunity]

provides ample protection to all but the plainly incompetent or those who

knowingly violate the law . . . .  If officers of reasonable competence would

disagree on the issue [whether or not a specific action was constitutional],

immunity should be recognized.") (quoting *Malley v. Briggs*, 475 U.S. 335, 341

(1986)); *supra* at p. 7.

Here, the Court finds that a reasonable officer would have considered the

force used by the Defendant officers to be excessive.  Although it may be proper

police procedure to use a canine to apprehend a suspect, the Court is not convinced

that a reasonable officer would consider it proper procedure to order or allow a

canine to bite and hold an unresisting suspect for more than one minute while other

officers stood by and laughed (*see supra* at pp. 12-13).  In fact, prior to this

incident, the Ninth Circuit had determined, in the context of a claim of excessive

force in the use of a police K-9 unit, that "it was clearly established that excessive

duration of the bite and improper encouragement of a continuation of the attack by

**MEMORANDUM DECISION AND ORDER - 19**

officers could constitute excessive force that would be a constitutional violation."
*Watkins*, 145 F.3d at 1093 (denying summary judgment on qualified immunity grounds where officer allowed canine to continue to bite suspect until suspect showed his hands even though suspect was surround by police officers with guns drawn).

Accordingly, the Court will deny qualified immunity to Defendant Officers Nance, Hunsaker, and Hofmann for the relevant period in question.

## C.    Plaintiff's State Law Claims

Plaintiff's third cause of action asserts state law claims against the Defendant officers for assault, battery, abuse of process, and negligence.  *See* Pl.'s Compl. At ¶ 35 (Docket No. 3).

### 1.    Assault and Battery Claims

Defendants argue that only Officer Nance's alleged actions could constitute an assault and battery and, under the Idaho Tort Claims Act, he is immune from such causes of action.  *See* Mem. in Supp. of Mot. for Summ. J., p. 13-14 (Docket No. 15, Att.6) (citing I.C. § 6-904(3) ("A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which . . . [a]rises out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process,

MEMORANDUM DECISION AND ORDER - 20

libel, slander, misrepresentation, deceit, or interference with contract rights.")).

The Court agrees that only Officer Nance's alleged conduct is the appropriate focus of Plaintiff's assault and battery claims – particularly when recognizing that the thrust of Plaintiff's claims revolves only around Officer Nance's initial decision to release Blek and the degree and duration of Blek's subsequent bite and hold.[11]  However, the Court cannot decide, as a matter of law, that the Idaho Tort Claims Act insulates Officer Nance against Plaintiff's assault and battery claims. While it is clear that Officer Nance was acting within the course and scope of his employment, a question of fact remains as to whether he acted "without malice or criminal intent" (*see supra* at pp. 12-15) as required by Idaho Code § 6-904(3).  As a result, summary judgment pursuant to Idaho Code § 6-904(3) is improper as to Officer Nance.[12]

2.    Abuse of Process Claim

Essential elements surrounding the tort of abuse of process are (1) an

---

[11]  Therefore, Defendants' Motion for Summary Judgment (Docket No. 15) is granted as to Plaintiff's assault and battery claims against Defendant Officers Hunsaker and Hofmann. Moreover, as mentioned earlier (*see supra* at p. 14, n. 10), Plaintiff offers no allegations against Defendant Officer Dustin, let alone any that resemble a sustainable claim against him for assault and battery.  Defendants' Motion for Summary Judgment (Docket No. 15) is additionally granted in this separate respect.

[12]  Consistent with this Court's discussion relating to the Plaintiff's constitutional claims, any viable assault and battery claim against Officer Nance appropriately relates only to the period of time after Plaintiff was subdued (*see supra* at pp. 12-15).

**MEMORANDUM DECISION AND ORDER - 21**

ulterior, improper purpose and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding.  *See Badell v. Beeks*, 115 Idaho 101, 104, 765 P.2d 126, 129 (1988).  Defendants argue that "[n]one of the officers acted in a manner that could constitute an abuse of process."  *See* Mem. in Supp. of Mot. for Summ. J., p. 14 (Docket No. 15, Att.6).  The Court agrees.

Here, Plaintiff's chief complaint centers on the manner Defendants detained him following his burglary at the Pacific Recycling building.  Importantly, there are no separate allegations that Defendants' conduct also amounted to an improper participation in procedures incident to any litigation process.

Absent any allegation tying Defendants' conduct to *any* improper procedure related to the litigation process, Plaintiff's abuse of process claim must fail.  As a result, summary judgment is appropriate as to all Defendant officers.

3.    Negligence Claim

In response to Plaintiff's negligence claim, Defendants argue simply that they are not negligent.  *See* Mem. in Supp. of Mot. for Summ. J., p. 14 (Docket No. 15, Att. 6) ("Defendants were not negligent in any of their actions regarding [Plaintiff].  The officers acted intentionally and at all times in accordance with Boise Police policies and training received.").

A negligence claim requires proof of:  "(1) a duty, recognized by law,

**MEMORANDUM DECISION AND ORDER - 22**

requiring the defendant to conform to a certain standard of conduct; (2) a breach of duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss or damage." *Coghlan v. Beta Theta Pi Fraternity*, 133 Idaho 388, 399, 987 P.2d 300, 311 (1999).  For the same reasons already mentioned with respect to Plaintiff's constitutional claims against Defendant officers once Plaintiff was subdued, as well as Plaintiff's assault and battery claims against Officer Nance during that same time, a question of fact remains as to whether Defendant officers breached their respective duties of care by permitting Blek to continue biting and holding Plaintiff after Plaintiff was subdued and while Plaintiff was lying flat on the ground, with his arms outstretched in full view of the officers.[13]

Because a question of fact exists as to a requisite element of Plaintiff's negligence claim, summary judgment is improper as to Officers Nance, Hunsaker, and Hofmann, but only with respect to the period of time after Plaintiff was subdued (*see supra* at pp. 12-15).

## IV.  ORDER

NOW THEREFORE IT IS HEREBY ORDERED that Defendants' Motion

---

[13]  Once again, because Plaintiff offers no allegations against Defendant Officer Dustin specific to any claim, including a negligence claim, Defendants' Motion for Summary Judgment (Docket No. 15) is granted in this separate respect.

**MEMORANDUM DECISION AND ORDER - 23**

for Summary Judgment (Docket No. 15) shall be, and the same is hereby, GRANTED in part and DENIED in part as follows:

1.      Defendant Officers Nance, Hunsaker, and Hofmann are entitled to summary judgment on Plaintiff's Fourth Amendment claim, with the exception of Plaintiff's claim that these Defendants waited an excessive period of time before ordering that Blek release Plaintiff.

2.      Defendant Officer Dustin is entitled to summary judgment on Plaintiff's Fourth Amendment claim.

3.      Defendant Officers Hunsaker, Hofmann, and Dustin are entitled to summary judgment on Plaintiff's assault and battery claims.

4.      Defendant Officers Nance, Hunsaker, Hofmann, and Dustin are entitled to summary judgment on Plaintiff's abuse of process claim.

5.      Defendant Officer Dustin is entitled to summary judgment on Plaintiff's negligence claim.

In accordance with this Order, the following claims remain:

A.      Plaintiff's Fourth Amendment claim against Defendant Officers Nance, Hunsaker, and Hofmann only with respect to the period of time after Plaintiff was subdued.

B.      Plaintiff's assault and battery claims against Defendant Officer Nance

**MEMORANDUM DECISION AND ORDER - 24**

only with respect to the period of time after Plaintiff was subdued.

C.   Plaintiff's negligence claim against Defendant Officers Nance, Hunsaker, and Hofmann only with respect to the period of time after Plaintiff was subdued.

IT IS FURTHER ORDERED that the parties shall participate in Alternative Dispute Resolution (ADR) prior to a trial setting by contacting, in writing, the ADR Coordinator, Susie Boring-Headlee at 550 W. Fort Street, Boise, Idaho 83724.  The ADR Conference shall take place within 90 days of this Order's entry.

DATED:  **July 6, 2009**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**MEMORANDUM DECISION AND ORDER - 25**